IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ION WAVE TECHNOLOGIES, INC., | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.12-cv-01341 (RGA) |
| | : | |
| SCIQUEST, INC., | : | |
| Defendant | : | |

Robert A. Penza, Esq. and Christopher M. Coggins, Esq., Wilmington, Delaware and Graham L.W. Day, Esq., St. Louis, Missouri, Attorneys for the Plaintiff.

Michael Busenkell, Esq., Wilmington, Delaware and Lawrence H. Kunin, Esq., Atlanta, Georgia, Attorneys for the Defendant.

MEMORANDUM OPINION

February 26, 2014

1

*Andrew G Andrews*
ANDREWS, U.S/DISTRICT JUDGE:

Before the Court are the defendant's motion for judgment on the pleadings (D.I. 17) and the related briefing (D.I. 18, 20, 22). For the reasons discussed, SciQuest, Inc.'s motion is granted in part and denied in part.

## BACKGROUND

In 2008, Ion Wave Technologies, Inc. ("IWT") and SciQuest, Inc. entered into a referral and resale agreement whereby SciQuest would sell IWT's software. (D.I. 1 at 2, ¶¶ 6-7). The agreement stated that SciQuest would use its standard Master License and Services Agreement ("MLSA") when providing its clients with IWT software. (*Id.*, ¶ 8). Among the clients were the University of Connecticut Health Center ("UCHC") and the Medical University of South Carolina ("MUSC"). (*Id.* at 3, ¶ 13). UCHC entered into a five-year MLSA with SciQuest, which was to end in 2013. (*Id.*, ¶ 14). MUSC had a seven-year MLSA, which was to end in 2017. (*Id.* at 5, ¶ 23).

The parties terminated the referral and resale agreement by mutual consent in 2011. (*Id.* at 4, ¶ 18; D.I. 18, p. 1). After the termination, SciQuest amended the MLSAs with two of its customers, UCHC and MUSC, and transitioned them off of the IWT software to SciQuest's own product, which deprived IWT of royalties. (D.I. 1 at 4, 6, ¶¶ 21, 30; D.I. 18, p. 1). In October 2012, IWT filed this suit against SciQuest for (i) breach of contract, (ii) anticipatory repudiation, (iii) breach of the implied covenant of good faith and fair dealing, and (iv) violation of the North Carolina Unfair and Deceptive Trade Practices Act. (D.I. 1 at 11, ¶¶ A-D). As a result of the Rule 16 conference and mediation, the parties identified early resolution of a discrete contract interpretation issue as being helpful. (D.I. 18, p. 1, n. 1).

2

SciQuest filed a motion for judgment on the pleadings under FED. R. CIV. P. Rule 12(c). (D.I. 17). SciQuest argues that the provision of the agreement that required SciQuest to get IWT's permission to amend MLSAs with clients did not survive the termination of the agreement under Section 11.3, which established the rights and responsibilities of the parties in case of termination. (D.I. 1-1 at 15-16, § 11.3; D.I. 18, pp. 1-2). IWT argues that SciQuest had "a continuing post-termination obligation" arising from Section 11.3(d), which says that SciQuest must "fulfill its reporting and payment obligations" and that it must "use commercially reasonable efforts to ensure that SciQuest customers of the IWT Sourcing Solution fulfill their license agreement obligations with respect to the IWT Sourcing Solutions." (D.I. 1-1 at 15-16, § 11.3(d); D.I. 20 at 4-5).

## DISCUSSION

### A. Legal Standard

A Rule 12(c) motion for judgment on the pleadings is reviewed under the same standard as a Rule 12(b)(6) motion to dismiss when the Rule 12(c) motion alleges that the plaintiff failed to state a claim upon which relief can be granted. *See Turbe v. Gov't of the Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991); *Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010). The court must accept the factual allegations in the complaint and take them in the light most favorable to the plaintiff. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406 (2009). "When there are well-ple[d] factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The court must "draw on its judicial experience and common sense" to make the determination. *See id.*

3

**B. Decision**

SciQuest's request for judgment on the pleadings requires this Court to interpret the IWT-SciQuest agreement as a question of law. The agreement states that it is to be interpreted under North Carolina law. (D.I. 1-1 at 18, § 12.17).

The IWT-SciQuest agreement is unambiguous, in my view. In addition, there are no identified disputes of fact for Counts I-III. Therefore, those counts are appropriate for resolution on the pleadings. *See Root v. Allstate Ins. Co.*, 158 S.E.2d 829, 832 (N.C. 1968) ("It is a well-recognized principle of construction that when the language of a contract is clear and unambiguous, the court must interpret the contract as written[.]"); *e.g., Mosley v. WAM, Inc.*, 606 S.E.2d 140, 142 (N.C. Ct. App. 2004).

Two provisions of the agreement are relevant here: Sections 3.2(e) and 11.3. Section 3.2(e) provided that SciQuest could make changes to a MLSA as long as IWT approved the changes that would impact IWT's rights or performance. Section 11.3 established the effects of the termination of the IWT-SciQuest agreement upon the agreement. Section 11.3(c) listed the parties' rights that survived the termination. It did not include the rights listed in Section 3.2(e). Section 11.3(d) provides generally that other rights and specified obligations will also survive termination of the IWT-SciQuest agreement until "termination or expiration" of the last MLSA. (D.I. 1-1 at 16, § 11.3(d)(iii)). In particular, Section 11.3(d)(iii) states that SciQuest "shall continue to . . . use commercially reasonable efforts to ensure that SciQuest customers of the IWT Sourcing Solution fulfill their license agreement obligations with respect to the IWT Sourcing Solutions[.]" (*Id.*).

4

The parties dispute whether SciQuest and its clients could amend their MLSAs after the termination of the IWT-SciQuest agreement. The list of rights that survived termination did not include IWT's right to approve material changes to customers' MLSAs. (D.I. 1-1 at 15, § 11.3(c)). Thus, the right to approve amendments did not survive under the rule of *expressio unius est exclusio alterius* (the expression of one is the exclusion of the other). *See Charlotte Union Bus Station v. C.I.R.*, 209 F.2d 586, 589-90 (4th Cir. 1954); *Smith Barney, Inc. v. Critical Health Sys. of N.C., Inc.*, 212 F.3d 858, 861 (4th Cir. 2000).

The remaining question, and the focus of the parties' arguments, is whether SciQuest violated Section 11.3(d)(iii) when it transitioned UCHC and MUSC to its own software. IWT argues that by "actively seeking to terminate [the] license agreement obligations," SciQuest was not meeting its obligation to use commercially reasonable efforts to ensure that its customers fulfilled their own license agreement obligations to IWT. (D.I. 20 at 11). This Court disagrees. This issue turns on the definition of the customers' "license agreement obligations."

This Court's view is that "license agreement obligations" refers to obligations under the MLSA as the obligations accrue. Thus, the MLSA could be terminated by agreement of SciQuest and its customer. This interpretation is consistent with the IWT-SciQuest agreement and the MLSA. It also accords with the business realities brought about by termination of the IWT-SciQuest agreements.

First, the phrase at issue also appears in the third sentence of Section 3.1(d) of the IWT-SciQuest agreement, where it does not require SciQuest to get IWT's permission to modify its MLSAs with customers. (D.I. 1-1 at 7, § 3.1(d)). The preceding sentence in Section 3.1(d) explains that SciQuest and its customers may amend their MLSAs with IWT's approval. (*Id.*).

To find that the third sentence means the same thing as the second sentence would render one of the sentences superfluous. *See Ray D. Lowder, Inc. v. N.C. State Highway Comm'n*, 217 S.E.2d 682, 693 (N.C. Ct. App. 1975) ("[A]n interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or superfluous[.]"). In Section 11.3(d)(iii), the language is exactly the same, but there is no additional sentence requiring SciQuest to seek IWT's permission to modify its MLSAs. Therefore, this Court finds that Section 11.3(d)(iii) allowed SciQuest and its customers to modify their agreements.

Second, the MLSA required SciQuest to try to ensure that its customers fulfilled the license agreement obligations listed in the MLSA. These MLSA obligations included specific obligations to IWT. For example, customers were not allowed to register one username for more than one person on IWT software. (D.I. 1-1 at 35, § 1.2). Customers were supposed to use commercially reasonable efforts to ensure that the information uploaded and the business performed on IWT's software was legal and accurate. (*Id.*). Customers were also not to permit others, including subsidiaries, affiliates, and contractors, to use the IWT software. (*Id.*, § 1.3). Further, the agreement prevented customers from transferring, renting, or subletting their software licenses. (*Id.*, §§ 1.2-1.4). Finally, under the MLSA, customers had confidentiality obligations to IWT. (*Id.* at 38, § 7.1). IWT had Section 11.3(d)(iii) in its agreement with SciQuest to ensure that customers would continue to fulfill their obligations after termination, not to prevent SciQuest and its customers from modifying the agreement to change software products.

6

Third, IWT had no rights under the MLSA. Section 8.13 of the MLSA states that no third party may be a beneficiary to the MLSA. (D.I. 1-1 at 39, § 8.13). IWT's rights stem from the IWT-SciQuest agreement, not the agreements between SciQuest and its customers. Therefore, SciQuest and its customers did not need IWT's permission to modify their MLSAs.

Fourth, it seems unlikely that the parties intended for SciQuest and its customers to be unable to amend their MLSAs once their agreement terminated. For example, if a customer's software needs changed and SciQuest agreed to alter the agreement, then SciQuest and the customer should not need IWT's approval once their referral and resale agreement ended. As SciQuest put it, those contracts would be "frozen in time." (D.I. 18, p. 8).

Regarding Claim IV, which alleges that SciQuest violated the North Carolina Unfair and Deceptive Trade Practices Act, the Court cannot resolve this issue based on the pleadings. IWT alleges, "SciQuest has committed unfair or deceptive acts or practices, and engaged in unfair methods of competition within the meaning of N.C.G.S.A. § 75-1.1." (D.I. 1 at 9, ¶ 53). SciQuest denies it. (D.I. 7 at 6, ¶ 53). There are material factual disputes, making this issue unsuitable for judgment on the pleadings.

In sum, SciQuest did not violate its contract with IWT. SciQuest's Motion for Judgment on the Pleadings is granted for Count I (Breach of Contract), Count II (Anticipatory Repudiation), and Count III (Bread of the Implied Covenant of Good Faith and Fair Dealing) and denied for Count IV (Violation of North Carolina Unfair and Deceptive Trade Practices Act).

A separate order will be entered.

7